UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIOVANNI MONTES,<br><br>    Plaintiff,<br><br>v.<br><br>SGT. MILLER,<br><br>    Defendant. | Case No. 22-cv-07229 JST<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF No. 34 |

Plaintiff has filed this *pro se* action pursuant to 42 U.S.C. § 1983, alleging that Sonoma County Jail sergeant Miller threw him to the ground as he was suffering a seizure, and then hit him in the head while he was in a prone position, in violation of the Fourteenth Amendment's prohibition of using excessive force on pretrial detainees. ECF Nos. 1, 9. Defendant Miller has filed a motion for summary judgment. ECF Nos. 34, 39. Plaintiff has filed an opposition to the summary judgment, ECF No. 40, and defendant Miller has filed a reply, ECF No. 41. For the reasons set forth below, the Court GRANTS defendant Miller's motion for summary judgment. ECF No. 34.

**DISCUSSION**

**I.   Factual Background[1]**

Since 2012, Plaintiff has been incarcerated at Sonoma County Male Adult Detention Facility ("MADF") twenty-four times. ECF No. 34-1 at 1-5 ("Grenier Decl."), ¶ 18. Plaintiff has a known history of behavior issues at MADF, including spitting on staff, threatening to assault staff, aggressive and disruptive behavior, and not following staff orders. ECF No. 34-4 ("Miller

---

[1] The following facts are undisputed unless otherwise noted.

1  Decl."), at ¶ 5; ECF No. 34-4 ("Geary Decl."), ¶ 8.

**A.  July 30, 2022**

On July 30, 2022, Plaintiff was arrested and booked at MADF on felony charges for grand theft and violation of parole. Sonoma Cty. Sup. Ct. C No. SCR-755591-1, PL-202093-1, *People v. Montes*. As Plaintiff was being booked into Sonoma County Jail, he suffered a seizure.

Plaintiff alleges in his complaint that, during his seizure, Sonoma County Jail sergeant Miller physically and verbally abused him by throwing him to the ground and hitting him in the head. Defendant Miller's actions cased Plaintiff pain in his back, head and neck. *See generally* ECF No. 1.[2] Plaintiff's allegations are contradicted by video footage captured on body worn cameras from multiple different deputies.

During the relevant event, deputies Geary, Fernandez, Valerio, and Pederson were present and wearing body worn cameras ("BWCs"). Defendant Miller was also wearing a body worn camera. The videos from the BWCs show that no force was used on Plaintiff. ECF No. 39. The BWC videos are consistent with the description of the relevant events as described by deputies Fernandez, Geary, Pedersen, and Valerio, and by defendant Miller in their respective declarations, ECF Nos. 34-2 ("Valerio Decl."), at ¶¶ 2-10; 34-3 ("Geary Decl."), at ¶¶ 3-12; 34-4 ("Miller Decl.") at ¶¶ 2-13; 35-5 ("Pedersen Decl."), at ¶¶ 2-9; and 35-6 ("Valerio Decl."), at ¶¶ 3-13. The BWC videos, docketed at ECF No. 39, show the events described below.

Around 5:43 pm, Sonoma County Deputy Valerio was conducting intake and filling out paperwork in the MADF booking area's pedestrian sally port. Deputy Valerio observed Plaintiff nodding off with his eyes closed. Deputy Valerio suspected that Plaintiff was under the influence. Plaintiff suddenly slumped over, slipped off the bench, and fell towards the floor. Deputy Valerio grabbed Plaintiff's left arm before Plaintiff landed on the floor on his right side. Deputy Valerio activated her BWC at this time. Deputies Geary and Fernandez responded to assist Plaintiff.

---

[2] The complaint also alleges that Plaintiff was placed in a filthy holding cell with urine on the floor. ECF No. 1 at 3. In the Court's January 27, 2023 screening order, the Court found that the sole cognizable claim in the complaint was the allegation that defendant Miller used excessive force during, and immediately subsequent to, Plaintiff's seizure, in violation of the Fourteenth Amendment. ECF No. 9 at 2. The Court did not find that the allegation regarding the condition of the holding cell stated a cognizable constitutional claim. *See generally* ECF No. 9.

1 Deputies Geary and Fernandez also activated their BWCs at this time. Plaintiff went into a seizure 2 and began to convulse. Deputy Valerio removed Plaintiff's scarf from his face and held his head 3 to prevent it from hitting the ground and the wall. Deputy Geary requested medical assistance.

4 After Plaintiff's seizure stopped, Plaintiff remained unconscious. Deputy Valerio 5 continued to hold Plaintiff's head so that it would not hit the wall. RN Kopriva arrived to provide 6 medical aid and started taking Plaintiff's vital signs. At approximately 5:44 p.m., defendant 7 Miller and deputy Pederson arrived, having been informed that Plaintiff was experiencing a 8 medical seizure. Prior to heading to the sally port, defendant Miller and deputy Pederson had 9 activated their BWCs.

10 Plaintiff awoke and groggily told RN Kopriva to get the fuck off him. RN Kopriva 11 attempted to apply a pulse oximeter on Plaintiff's finger. Plaintiff grew agitated and yelled that 12 RN Kopriva was hurting him and that it was really tight. Deputies told Plaintiff that the nurse was 13 just taking his blood pressure, but Plaintiff became further agitated. The deputies held Plaintiff by 14 his wrists and legs to keep him still. Plaintiff started yelling, "Don't you, don't you, don't you 15 move my fucking head." Plaintiff accused RN Kopriva of bending his finger, yelled repeatedly 16 that it was "really tight," demanded that they "un-loose it;" and yelled that he didn't want RN 17 Kopriva touching him. Plaintiff kept yelling that there was no circulation, that he did not want his 18 hand bent, and that they should stop touching his hand. Video footage confirms that no one was 19 touching Plaintiff's hand; that Plaintiff was gripping a deputy's hand tightly; and that deputies 20 were firmly, but not violently, keeping Plaintiff in place.

21 Around 5:48, Defendant Miller knelt next to Plaintiff's head and addressed him by name: 22 "Hey Montes, take a breather, man. Hey hey hey, it's Miller." Plaintiff continued to yell, "It's 23 tight, it's really tight, it's really tight." Defendant Miller told Plaintiff that no one was hurting 24 him, and that Plaintiff would not be moved until he calmed down. Plaintiff continued to yell that 25 he had a seizure, that it was too tight, that they should get off his wrist and knuckles, that they 26 should stop, and that it hurt. The videos show that deputies were calmly holding Plaintiff in place 27 and waiting for him to calm down. Defendant Miller kneeled down, put his hand on Plaintiff's 28 head and said, "Hey, listen to me, I'm going to loosen it up but I need you to hold still okay?"

3

Plaintiff continued to moan that it hurt. Defendant Miller asked Plaintiff to say, "yes or no" or say "Miller, I hear you, I want to loosen it." Plaintiff did not respond to defendant Miller and instead continued to groan and yell that it hurt. Defendant Miller loosened the handcuffs. As the deputies worked at loosening Plaintiff's handcuffs, Plaintiff yelled that it hurt and that the deputies were liars. Plaintiff angrily asked "Why are you touching my fucking hands?" Deputies then conducted a pat-search of Plaintiff, taking off his pants, shoes, and socks and reaching under his shirt. Plaintiff continued to yell agitatedly that it hurt, asking if the deputies knew who he was, yelling that he posed no threat, and demanding that the deputies get off his hands. Defendant Miller called Plaintiff by name and lightly tapped Plaintiff on his head. Defendant Miller told Plaintiff to relax, stop talking, and just breathe. The deputies told Plaintiff that his wrists were straight. Plaintiff insisted that he could feel that his arms, wrists, and hands were bent. Plaintiff said that he would not take a breather and yelled that the deputies should take a breather. Defendant Miller placed his hand on Plaintiff's head, using light pressure to keep Plaintiff in place, as he asked Plaintiff to cooperate. Plaintiff yelled that defendant Miller should take his hand off Plaintiff's head. Defendant Miller shifted his hand to Plaintiff's back. Defendant Miller asked Plaintiff if he could walk to the cell or if he would need a wheelchair. Defendant Miller told Plaintiff that they would wait until he was ready. Defendant Miller instructed the other deputies to roll Plaintiff to get him into a standing position, while simultaneously instructing Plaintiff to go nice and slow.

After this point, defendant Miller had no more physical contact with Plaintiff. Plaintiff was escorted by deputies Geary and Fernandez to BK-06, a booking sobering cell. Because the toilet in BK-06 was not functional, Plaintiff was moved to BK-11 by deputies Fernandez and Pedersen after less than five minutes in BK-06. In Cell BK-11, deputies Fernandez and Pedersen instructed Plaintiff to kneel on the bench. Deputies Fernandez and Pedersen removed Plaintiff's handcuffs, and the deputies exited the cell.

**B.      Sonoma County Jail Grievance Process**

The Sonoma County Sheriff's Office provides a formal process for incarcerated persons to grieve conditions of confinement. To initiate the grievance process, the incarcerated person fills

4

1  out a grievance form within fourteen days of the occurrence of the issue being grieved and submits
2  the form to a deputy. If dissatisfied with the deputy's response, the incarcerated person may
3  request a supervisor review of his grievance by submitting the grievance to the supervising
4  Sergeant. If dissatisfied with the supervising Sergeant's response, the incarcerated person may
5  request a Disciplinary Grievance Officer ("DGO") review of his grievance by submitting the
6  grievance to the DGO. The next and final step in the grievance process is to submit the grievance
7  to the designated Lieutenant. Administrative remedies are exhausted when the incarcerated person
8  has received a decision from the lieutenant. Grenier Decl., ¶ 16 and Ex. G. The Sonoma County
9  Sheriff's Office's ordinary course of business is to document grievances by assigning the
10 grievance a specific reference number and documenting the grievance in the incarcerated person's
11 file. Grenier Decl., ¶ 19.

12 During his twenty-four incarcerations at MADF, Plaintiff has filed eleven grievances, five
13 of which he exhausted at the final level. Grenier Decl., ¶ 18. The Sonoma County Sheriff's
14 Office has no record for any grievance filed by Plaintiff related to the July 30, 2022 incident.
15 Grenier Decl. ¶¶ 19, 20, 23.

16 In the complaint, Plaintiff alleges that he filed a grievance about the claim raised in this
17 complaint: "No response as of yet. They have not given me a number. They never responded to
18 grievances or complaints." ECF No. 1 at 1. Plaintiff acknowledges in his complaint that he did
19 not exhaust his grievance to the highest level. ECF No. 1 at 2.

20 **II.     Summary Judgment Motion**

21 Defendant Miller argues that he is entitled to summary judgment for the following reasons:
22 (1) Plaintiff has not exhausted his administrative remedies; (2) there is no triable issue of fact as to
23 whether defendant Miller used force that was either objectively unreasonable or unrelated to the
24 legitimate government interest in maintaining safety and security within Sonoma County Jail;
25 (3) defendant Miller is entitled to qualified immunity; and (4) Plaintiff's request for damages is
26 barred under 42 U.S.C. § 1997e because Plaintiff suffered, at most, *de minimis* physical damages.

5

*See generally* ECF Nos. 34, 41.[3]

Plaintiff's opposition does not dispute that the video footage contradicts his version of events and that he did not exhaust his administrative remedies. Instead, Plaintiff argues that there was "more to [the incident];" that the tapping on his head caused him pain; and that because he had just had a seizure, "there shouldn't be no knocking on no one's head at all . . ." ECF No. 40 at 1. Plaintiff states that defendant Miller "want[s] to say how I did this and I did that," but that the relevant issue is that the local newspaper has reported on how "they" abused, assaulted, and used excessive force on him and nineteen other inmates. Plaintiff states that "they did [him] wrong an[d] they get away with it." Plaintiff's opposition concludes, "Of there no justice going on I'm gonna take action's in my own hand's of what they get away with . . . tyred being fuck'd with I'm ready." *See generally* ECF No. 40.[4]

### A.   Summary Judgment Motion Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

---

[3] Defendant also argues that he is entitled to summary judgment on the claim that Plaintiff was placed in a filthy holding cell with urine on the floor. ECF No. 34 at 22-23. The Court does not address this argument as the Court did not find this allegation to state a cognizable constitutional claim. ECF No. 9.

[4] In his opposition, Plaintiff makes other general allegations regarding misconduct at the jail. He alleges that correctional staff and nursing staff are "no good" and show favoritism; that officers are dirty and racist; that officers single out inmates; that officers "play with" inmates' mental health; that officers like to "start stuff" with inmates; that officers like to "do business" with other inmates; and that officers are holding grudges regarding a May 2015 event for which Plaintiff never received anything. *See generally* ECF No. 40. Plaintiff alleges that that there is Youtube and video evidence of other inmates being treated poorly, and that some of the footage is erased. Because these allegations do not concern the July 30, 2022 incident, the Court does not consider these allegations in resolving the summary judgment motion.

6

1  party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an
2  essential element of the nonmoving party's case necessarily renders all other facts immaterial."
3  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial
4  burden of identifying those portions of the record that demonstrate the absence of a genuine issue
5  of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings
6  and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on
7  file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324
8  (citing Fed. R. Civ. P. 56(e)).

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631. If the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

**B.     Excessive Force Claim**

   **1.     Legal Standard**

The Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Claims of excessive force brought by pretrial detainees are analyzed under the "objective reasonableness" standard, which considers whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them, regardless of the officer's underlying intent or motive. *Kingsley*, 576 U.S. at 396-97. In analyzing whether an officer's use of force was objectively unreasonable, courts must balance "[the state's] legitimate interests . . . [in] manag[ing] the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 576 U.S. at 397 (cleaned up). Courts may consider a variety of factors to determine

whether the force used was objectively unreasonable, including: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Id.* at 397.

### 2. Analysis

Videos of the relevant events, ECF No. 39, contradict Plaintiff's version of the events. Plaintiff does not dispute the accuracy or authenticity of these videos. Nor has Plaintiff plausibly alleged that what the videos depict differs from what actually happened. Although the Court must view the record in the light most favorable to Plaintiff, here the Court may properly view the facts in the light depicted by the videos to the extent that the footage and audio blatantly contradict Plaintiff's version of events. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *see also Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022) ("for purposes of ruling on a motion for summary judgment, a district court may properly view the facts in the light depicted by bodycam footage and its accompanying audio, to the extent the footage and audio blatantly contradict testimonial evidence") (applying rule set forth in *Scott v. Harris*, 550 U.S. 372 (2007) to other types of evidence capable of objectively disproving witness testimony). The videos show that Plaintiff was agitated, aggressive, and unable to calm down; that deputies restrained Plaintiff to keep him safe and to keep the facility safe; that Plaintiff inaccurately perceived the amount of force being used; and that Plaintiff's agitation prevented deputies from providing medical assistance and from conducting a pat-down search. The videos also show that defendant Miller's only physical contacts with Plaintiff were (1) lightly tapping Plaintiff's head to get Plaintiff's attention and to calm him down, and (2) placing his hand firmly on the back of Plaintiff's held Plaintiff's head to keep him still. ECF No. 39. Defendant Miller's actions were objectively reasonable in light of Plaintiff's agitation, the concerns for Plaintiff's health, and the jail's safety concerns. Plaintiff argues that no one should

8

tap the head of someone who just suffered a seizure, but has not explained why a light tap is objectively unreasonable, in particular in these circumstances. The Court finds that Plaintiff has failed to establish a triable issue of material fact as to whether defendant Miller used force, much less excessive force, in interacting with Plaintiff on July 30, 2022. The Court GRANTS summary judgment in favor of defendant Miller.

### C. Qualified Immunity

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Because there was no violation of Plaintiff's constitutional rights, as explained above, there is no necessity for further inquiries concerning qualified immunity. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

### D. Exhaustion of Administrative Remedies and Damages Claims

In light of the Court's grant of summary judgment in favor of Defendant, the Court declines to address the arguments regarding whether Plaintiff exhausted administrative remedies for his claims and whether Plaintiff's claim for damages should be dismissed.

/ / /

/ / /

/ / /

/ / /

/ / /

**CONCLUSION**

For the reasons set forth above, the Court GRANTS Defendant's motion for summary judgment. ECF No. 34. Judgment is entered in favor of Defendant and against Plaintiff. The Clerk shall close the case.

This order terminates ECF No. 34.

**IT IS SO ORDERED.**

Dated: October 3, 2025



JON S. TIGAR
United States District Judge